# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES, | * | |
|    Plaintiff, | * | |
| v. | * | Criminal Action No. 8:17-cr-00382-PX |
| LUIS FLORES-REYES, | * | |
|    Defendant. | * | |

\*\*\*
## MEMORANDUM OPINION

Pending before the Court is Defendant Luis Flores-Reyes' motions to suppress the fruits of a warrantless search and subsequent search warrant. ECF Nos. 408, 409. On November 8, 2019, the Court held a motions hearing during which the arresting officer and affiant, Detective Paul Hellwig of the Fairfax County Police Department, testified. ECF No. 449-1. The Court subsequently ordered supplemental briefing on whether probable cause existed to arrest Flores-Reyes on suspected drug distribution, and if not, whether sufficient probable cause supports the search warrant executed two days later. The Court has received the briefing, ECF Nos. 453, 454, and for the following reasons, the Court finds Flores-Reyes was the subject of a warrantless arrest without probable cause, and all fruits of that arrest must be suppressed. Further, the Court concludes that when it excises from the search warrant affidavit the facts obtained as a product of Flores-Reyes' unconstitutional warrantless arrest, the search warrant was obtained without probable cause. Thus, the Court grants Defendant's motion to suppress the fruits of the search warrant.[1]

---

[1] At the hearing, the Government represented that it will not seek to introduce the fruits of Flores-Reyes' warrantless arrest at trial, and thus Defendant's separate challenge to the constitutionality of the stop, search and arrest of Flores-Reyes on January 30, 2018, was moot. However, because the warrant affidavit included the January 30 arrest and information learned during Flores-Reyes' post-arrest interview, the Court took evidence on whether

**I.    Facts**

Detective Hellwig has spent the last seventeen years as an undercover officer in the narcotics unit. ECF No. 449-1 at 5:18–6:2. In January of 2018, Hellwig was working with a confidential informant ("CI") who told Hellwig he could purchase cocaine from a target, Caesar Martinez, who is not a defendant in this case. *Id.* at 7:1–25. On or about January 16, 2018, the CI arranged to purchase $600 worth of cocaine from Martinez. *Id.* at 8:1–8. However, at the time of the sale, Martinez only had $160 worth of cocaine available and told the CI that his supplier was close by and that he could get the rest. *Id.* at 8:8–9:1. Hellwig and his team chose to end the undercover sale rather than have Martinez obtain more drugs from the supplier. *Id.* at 8:23–9:1.

Two weeks later, on January 30, 2018, the CI set up another controlled purchase with Martinez at Hellwig's direction. *Id.* at 9:5–10. The plan was for the CI to meet Martinez in a shopping center parking lot to purchase two "eight-balls" of cocaine. *Id.* at 9:13–23. Martinez was to arrive alone and by car, and to be arrested before the sale was consummated. *See id.* at 9:24–10:4, 23:3–13.

Martinez arrived at the shopping center driving a white 2011 four-door Dodge Avenger. *Id.* at 10:14–18, 28:16–17. Flores-Reyes was in the front passenger seat. *Id.* at 10:14–18, 28:16–17. Both the CI and Hellwig recognized Martinez but not Flores-Reyes. *Id.* at 10:22–23. Hellwig also acknowledged that he had "no idea" who the passenger was, nor did he expect anyone to be traveling with Martinez. *Id.* at 24:1–17. Hellwig observed the CI and Martinez talking by phone while Martinez got out of the vehicle, walked around briefly, and then returned to the car. *Id.* at 10:24–11:5. Shortly after Martinez got back into the driver's seat, the arrest

---

Flores-Reyes was subjected to a warrantless arrest lacking in probable cause as it pertained to the constitutional validity of the search warrant.

2

team descended on the vehicle, as planned.  *Id.* at 11:23–12:5.

On direct examination, Hellwig testified that at this moment, "both men were taken into custody while sitting in the vehicle."  *Id.* at 12:1–5.  Hellwig confirmed that both Martinez and Flores-Reyes were removed from the vehicle and handcuffed.  *Id.* at 12:3–13, 27:24–25.  Officers then executed a search of the vehicle and found "two baggies of cocaine, approximately eight-balls, three and a half grams in size on the floorboard between the driver's seat and the passenger seat."  *Id.* at 12:14–19.  Both individuals were then taken "to the Mason District Station for an interview and then later processed into [the] Adult Detention Center."  *Id.* at 12:22–25.  Hellwig further testified that because "[n]either one took responsibility for the cocaine," they were both "taken into custody . . . and charged."  *Id.* at 13:1–7.

At the station, Flores-Reyes was interrogated.  *Id.* at 12:22–25, 30:6–8.  During the interrogation, Flores-Reyes misrepresented the precise apartment in which he lived.  *Id.* at 15:2–7, 42:16–23.  Martinez was separately interrogated and identified Flores-Reyes as his supplier.  *Id.* at 13:20–25.  Hellwig also described further investigation in which he learned from the FBI that Flores-Reyes was a suspect in a federal investigation and that the FBI possessed historic information from a separate confidential informant who was a drug consumer and had been in Flores-Reyes' apartment at some unspecified point in the past.  *Id.* at 15:15–18, 34:7–22.

On cross examination, however, Hellwig clarified his testimony in important and material ways.  First, Hellwig confirmed that Reyes was "arrested" at the same time as Martinez and at a point in time where "all Mr. Flores-Reyes had done was sit in the car."  *Id.* at 27:19–23.  Hellwig further described that at the point of arrest, Flores-Reyes was handcuffed, was not free to leave, and was eventually transported to the station after the drugs were located in the vehicle.  *Id.* at 27:24–28:8.

Second, and critically with regard to the constitutionality of Flores-Reyes' arrest, Hellwig described having found the drugs not on the floorboard between the two men, but rather on the driver's side, closest to Martinez and on the other side of the center console and gear shift that physically separated the driver and passenger sides. *See id.* at 28:10–29:25. When asked to clarify precisely where the drugs were found, Hellwig attested as follows:

> Q: You found what you believed to be drugs on the floorboard between the front passenger and driver's side?
> A: Right along—yep. Right on the floor, **right along the driver's side where the console meets the passenger seat and driver seat.**
> Q: Okay. So this is a 2011—a 2011 Dodge Avenger, four-door white, correct?
> A: Correct.
> Q: All right. Now, like most four-door cars made in this century, they have a center console?
> A: Correct.
> Q: And there are bucket seats . . .?
> A: Correct.
> Q: So there is an area where the driver will sit and then there is the passenger seat, right?
> A: Correct.
> Q: And within that center console often times you have the armrest that can open up for storage?
> A: Uh-huh . . . .
> Q: And so the contraband that you found was not on the right side of the vehicle where the passenger was seated, but, **rather, it was on the driver's side**?
> A: **Correct.**
> Q: **—of the vehicle—**
> A: **Yep.**
> Q: —right? **Close to where the driver's right leg would be?**
> A: **Correct.**

*Id.* (emphasis added); *see also id.* at 55 (re-confirming that the drugs were found on the driver side of the physical barriers in the middle of the car's interior, to include the gear shift and the center console. "Q: So if I were, as an example, a passenger in the front seat car, the drugs that are on the driver's side—right?—there is a center console area separating [the passenger] and those drugs? A: Correct.").

Based on Hellwig's arrest of Flores-Reyes and the post arrest investigation, Hellwig

4

swore out an affidavit in support of executing a search warrant on the Defendant's apartment. *Id.* at 14:18–25. The entirety of Hellwig's probable cause statement reads as follows:

> Luis Flores Reyes [date of birth omitted], was arrested and charged with PWID cocaine in **Fairfax County** on January 30th 2018 in connection with a suspected drug deal involving cocaine. Luis Flores Reyes did not have identification at the time of his arrest and was held without bond. During a post-arrest interview, Luis Flores-Reyes stated to law enforcement officers he lives at **4106 4th St North Arlington (Arlington County), Virginia**, but stated it was apartment 4. Your affiant believes Luis Flores Reyes is being deceptive about his exact apartment in an attempt to conceal further evidence. Records check to include employment and W2s confirmed Luis Flores Reyes lives at **4106 4th Street Apt 2, North Arlington, (Arlington County), Virginia.** Prior to the arrest day, Flores Reyes was observed by law enforcement officers, exiting and entering the residence of **4016 4th Street North Arlington (Arlington County), Virginia.**
>
> During the month of October 2017, law enforcement officers were able to cultivate a Confidential Informant, who will hereinafter be referred to as C/I #1. C/I #1 is a self-admitted member of the drug subculture. C/I #1 had made numerous statements against his/her penal interest regarding the prior use and sale of illegal drugs/narcotics. C/I #1 had given information concerning drug dealers who are currently dealing cocaine in Virginia.
>
> C/I #1 stated he/she entered the residence of **4106 4th St North Arlington (Arlington County), Virginia** to meet with Luis Flores Reyes and went into the apartment located on the top left side. Law enforcement officers were able to enter the building at a later date and confirm the top left apartment is apartment 2.

ECF No. 436-1 at 10–11 (emphasis in original).

Based on this affidavit, Hellwig obtained permission from a Fairfax County magistrate judge to search Apartment #2, where law enforcement believed Flores-Reyes resided, and seized narcotics and several items related to the drug trade. *Id.* at 11. The validity of the search warrant is at the center of this dispute.

## II. Analysis

### A. Flores-Reyes' Arrest

Flores-Reyes maintains that because the officers lacked probable cause to arrest him for a crime, he was subjected to an unconstitutional warrantless arrest. The Court agrees. "Probable cause" to arrest a suspect exists where an officer obtains information "sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Probable cause is a flexible concept, driven by the facts available to the officer at the time of the encounter. *United States v. Green*, 740 F.3d 275, 281–82 (4th Cir. 2014). Pertinent to this analysis, mere proximity to someone else committing an offense alone is not sufficient particularized evidence supporting probable cause as to the bystander. *See United States v. Di Re,* 332 U.S. 581, 587 (1948) ("We are not convinced that a person, by mere presence in a suspected car, loses immunities from search of his person to which he would otherwise be entitled."); *see also Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. . . . Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person.").

The Government relies heavily on *Maryland v. Pringle* to support the constitutionality of Flores-Reyes' arrest. 540 U.S. 366 (2003). In *Pringle*, a Baltimore County patrol officer stopped a vehicle for speeding. *Id.* at 368. No evidence suggested that the officer knew or had any previous contact with the driver or his two passengers. *See id.* After obtaining consent to search the vehicle, the officer located $763 in cash in the glove compartment directly in front of

Pringle, who was seated in the front passenger seat. *Id.* The officer also located five glassine baggies stored in the backseat armrest that contained what ultimately turned out to be narcotics. *Id.* Neither the driver nor the two passengers claimed ownership of the items found. *Id.* at 368–69. All three men were arrested on suspicion of drug possession. *Id.*

Pringle challenged the constitutionality of his arrest, arguing that the officer lacked probable cause based on his mere presence in close proximity to the drugs. *Id.* at 369, 372–73. The Court ultimately held that it was "an entirely reasonable inference from these facts that any or all three of the occupants had knowledge of, and exercised dominion and control over, the cocaine. Thus, a reasonable officer could conclude that there was probable cause to believe Pringle committed the crime of possession of cocaine, either solely or jointly." *Id.* at 800–01.

The Government in this case maintains that *Pringle* controls. This Court disagrees. The Court begins by emphasizing, as the Supreme Court did, that *Pringle*'s holding was limited to its unique facts. Notably, unlike this case, the officer in Pringle had no prior information about any of the gentlemen in car. This fact was dispositive to the Court. *Id.* at 801. Indeed, the Court contrasted *Pringle* with its prior determination in *United States v. Di Re*, 332 U.S. 581 (1948) to illustrate this very point.

In *Di Re,* a confidential informant tipped off a federal investigator that the driver of a vehicle, Reed, possessed counterfeit gas coupons. *Id.* at 583. The investigator spotted the vehicle and Reed at a gas station. *Id.* Reed was outside the vehicle while two passengers were inside. *Id.* Reed admitted to the investigator that the backseat passenger, Buttitta, had given Reed the coupons. *Id.* Upon receiving that information, the investigator removed from the vehicle Buttitta and Di Re, who was seated in the front passenger seat. *Id.* All three men were then searched and arrested. *Id.* The Court ultimately held that Di Re's arrest lacked probable

7

cause. *Id.* at 595. In so holding, the Court noted that despite Di Re's presence in the car, none of the information learned by the investigator at the time specifically incriminated Di Re. *Id.* at 593–94. As is the case here, the *Di Re* Court noted that:

> [W]hatever suspicion might result from Di Re's mere presence seems diminished, if not destroyed, when Reed, present as the informer, pointed out Buttitta, and Buttitta only, as a guilty party. No reason appears to doubt that Reed willingly would involve Di Re if the nature of the transaction permitted. Yet he did not incriminate Di Re. Any inference that everyone on the scene of a crime is a party to it must disappear if the Government informer singles out the guilty person.

*Id.* at 594.

Critically, and overlooked by the Government, is that the Court in *Pringle* reaffirmed the vitality of *Di Re*. Confining its holding to the specific facts presented, the *Pringle* Court reasoned that, in *Di Re*, "[w]e said '[a]ny inference that everyone on the scene of a crime is a party to it must disappear if the Government informer singles out the guilty person.' . . . No such singling out occurred in this case; none of the three men provided information with respect to the ownership of the cocaine or money." *Id.* at 801 (citation omitted) (quoting *Di Re*, 332 U.S. at 594). In so doing, the Court made clear that *Pringle* does not stand for the broad proposition that any time contraband is found in a vehicle, that contraband supplies probable cause to arrest all occupants. But this is precisely the reading that the Government encourages the Court to give *Pringle*.

Rather, as the Court in *Pringle* and *DiRe* directs, this Court must consider whether the totality of the evidence available to law enforcement at the time singled out one occupant as the culpable possessor of the drugs found. That is this case.

At the time law enforcement arrested Flores-Reyes, they knew him only as an unexpected, unidentified passenger. By contrast, the CI knew, identified, and singled out

Martinez as the suspect whom everyone expected would carry drugs to scene of the pre-scheduled drug sale. Further, the drugs were located next to Martinez' leg and within his easy reach. The evidence thus corroborated that Martinez was there to consummate a second cocaine deal much like the first that occurred with the same CI and in Hellwig's presence just two weeks ago.

Further, no evidence exists that Flores-Reyes knew of or had access to the narcotics at the time of his arrest. The narcotics, Hellwig admitted, were not only next to Martinez's leg; they were physically separated from Flores-Reyes by the center console, armrest and gearshift. In this respect, this case differs materially from *Pringle* in that the narcotics were not equally "accessible" to all occupants in the car. *Cf. Pringle*, 540 U.S. at 372. Thus, based on these facts, this case cleaves far more closely to *Di Re* than *Pringle*.

On this point, the Government presses that the narcotics were in "arms reach" of Flores-Reyes. But no evidence suggest that Flores-Reyes knew the drugs were there or could see them. To suggest that mere proximity to drugs could supply probable cause, regardless of the circumstances surrounding such proximity, does violence to the fact-specific analysis required to determine whether a suspect's arrest is constitutional. *Di Re,* 332 U.S. at 587; *Ybarra*, 444 U.S. at 91. Because the officers lacked probable cause to arrest Flores-Reyes, the arrest itself and all evidence flowing from such arrest must be suppressed.

More particularly, the evidence unconstitutionally obtained includes not only fact of Flores-Reyes' arrest itself, but the custodial interrogation that directly flowed from his arrest. Indeed, had Flores-Reyes *not* been arrested, Fairfax County officers would not have interrogated him while in custody, and thus would not have obtained his statement regarding his living in Apartment 2 versus Apartment 4. ECF No. 449-1 at 12:22–25; *Wong Sun v. United States*, 371

9

U.S. 471, 485–86 (1963) (suppressing statements which were immediately derived from illegal entry and arrest). All statements made by Flores-Reyes made in the immediate aftermath of his arrest, as fruits of the poisonous tree, are likewise suppressed.[2]

### B. Validity of Search Warrant

The Court next turns to the Defendant's challenge to the validity of the search warrant. First, the Court must set aside the unconstitutionally-obtained information that Hellwig included in his affidavit supporting the search warrant and then determine whether the remaining information "supports a finding of probable cause." *United States v. Lull*, 824 F.3d 109, 114 (4th Cir 2016). The Court must excise reference to Flores-Reyes' arrest and any information law enforcement obtained as a consequence of his booking and post-arrest interview shortly thereafter. *United States v. Gillenwaters*, 890 F.2d 679, 681–82 (4th Cir. 1989); *United States v. Parker*, 979 F.2d 869 (4th Cir. 1992) (unpublished table decision). This stricken information, *at a minimum*, is the following:

> ~~Luis Flores Reyes [date of birth omitted], was arrested and charged with PWID cocaine in Fairfax County on January 30th, 2018 in connection with a suspected drug deal involving cocaine. Luis Flores Reyes did not have identification at the time of his arrest and was held without bond. During a post-arrest interview, Luis Flores Reyes stated to law enforcement officers he lives at 4106 4th St North Arlington (Arlington County), Virginia, but stated it was apartment 4. Your affiant believes Luis Flores Reyes is being deceptive about his exact apartment in an attempt to conceal further evidence. Records check to include employment and W2s confirmed Luis Flores Reyes lives at 4106 4th Street Apt 2, North Arlington, (Arlington County), Virginia.~~ Prior to the arrest day, Flores Reyes was observed by law enforcement officers, exiting and entering the residence of 4016 4th Street North Arlington (Arlington County), Virginia.
>
> During the month of October 2017, law enforcement officers were able to cultivate a Confidential Informant, who will hereinafter be

---

[2] The Court further finds that none of the exceptions to the poisonous tree doctrine apply here. *See Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016).

10

> referred to as C/I #1. C/I #1 is a self-admitted member of the drug subculture. C/I #1 had made numerous statements against his/her penal interest regarding the prior use and sale of illegal drugs/narcotics. C/I #1 had given information concerning drug dealers who are currently dealing cocaine in Virginia.
>
> C/I #1 stated he/she entered the residence of 4106 4th St North Arlington (Arlington County). Virginia to meet with Luis Flores Reyes and went into the apartment located on the top left side. Law enforcement officers were able to enter the building at a later date and confirm the top left apartment is apartment 2.

*See* ECF No. 436-1 at 10–11.

Based on the above information, no reasonable judicial officer could find that probable cause existed that evidence of drug dealing would be found in the place to be searched. At best, a "self-admitted member of the drug subculture" met Flores-Reyes in his home. This does not provide the judicial officer any basis on which to authorize execution of a search to look for evidence of drug distribution. Accordingly, all evidence seized in connection with the warrant is likewise suppressed.

The Government presses that the Fourth Circuit's good faith analysis in *United States v. McKenzie-Gude* compels a different result. 671 F.3d 452, 460 (4th Cir. 2011). The good faith exception to the exclusionary rule provides that courts should not "suppress the fruits of a search conducted under the authority of a warrant, even a subsequently invalidated warrant, unless a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Bynum*, 293 F.3d 192, 195 (4th Cir. 2002). In *Mckenzie-Gude*, the warrant affidavit in question included abundant evidence to establish probable cause that prohibited weapons would be located in the residence ultimately searched. *Id.* at 455–56, 459. However, law enforcement inadvertently omitted from the affidavit the street address of the target residence, thus failing to establish the "nexus" between the criminal conduct

and the home. *Id.* at 456–58. In holding that the officers could, in good faith, rely on the warrant, the *McKenzie-Gude* court determined that where an officer knew "uncontroverted facts" that support probable cause but "inadvertently" failed to disclose such facts to the magistrate judge, the reviewing court could consider those facts in applying the good faith exception. *Id.* at 460. If the known but undisclosed facts allow for "objectively reasonable reliance on the warrant," says *McKenzie-Gude*, then the evidence from the search warrant shall not be suppressed. *Id.* at 461.

Here the Government points to Martinez identifying Flores-Reyes generally as his supplier to Hellwig, ECF No. 449-1 at 13:20–25, in combination with Martinez's prior reference to getting "the rest of" the drugs from his "supplier" during the first controlled sale, ECF No. 449-1 at 8:25–9:1, as the missing information which demonstrates that Hellwig's reliance on the warrant in question was objectively reasonable, *see* ECF No. 436 at 15–16. However, this case differs fundamentally from *McKenzie-Gude* in that Hellwig did not merely omit pertinent facts from his warrant affidavit, he also *included* facts from a previous, unconstitutional search. Under these circumstances, it is not all clear to the Court that the "good faith" analysis is even implicated if the affidavit, once excising the unconstitutionally-obtained information, no longer demonstrates probable cause. *See Gillenwaters*, 890 F.2d at 681–82. In this circumstance, the good faith exception's focus on "objectively reasonable reliance on the warrant," *Mckenzie-Gude*, 671 F.3d at 461, seems wholly inapplicable. The Government cites no authority to the contrary.

That said, even if the Court looks to the additional facts known to Hellwig at the time, those facts do not establish probable cause that evidence of drug activity would be found in Apartment 2. Martinez shared no information with Hellwig about how, when or where Martinez

12

obtained drugs from Flores-Reyes. Rather, all Hellwig knew was that during Martinez's custodial interrogation, Martinez pointed to the room where Flores-Reyes was seated and said "[h]e's the dealer. He's the man. He's the one you want." ECF No. 449-1 at 13:20–25. The only other information in the affidavit not unconstitutionally obtained came from the other informant who could identify the apartment as belonging to Flores-Reyes based on the informant's mere presence three months' prior.[3] Thus, in stark contrast to *McKenzie-Gude*, where the uncontroverted but missing fact was merely the address of the place to be searched, *no facts* of drug dealing support that probable cause existed for the place ultimately searched, even when crediting the "omitted" information. *Cf. United States v. Lalor,* 996 F.2d 1578, 1582 (4th Cir. 1993) (where affidavit is "devoid of any basis from which the magistrate could infer that evidence of drug activity would be found at" defendant's residence, search warrant lacked probable cause). Because the information known but not disclosed in the affidavit does not supply sufficient probable cause to search the residence, the warrant was unconstitutionally obtained. Accordingly, all evidence seized in connection with the execution of the warrant must be suppressed.

### III. Conclusion

Based on the foregoing, Flores-Reyes' motions to suppress the fruits of a warrantless search and subsequent search warrant are GRANTED. A separate Order follows.

__12/27/2019_____  
Date


____/s/_____  
Paula Xinis  
United States District Judge

---

[3] There is serious reason to believe that the FBI's information would be excised from the warrant as well. The FBI contacted Detective Hellwig in response to Flores-Reyes's arrest, and only then provided him their information concerning Apartment 2 and how it was connected to Flores-Reyes. *See* ECF No. 449-1 at 32:1–34:25, 35:21–24. Thus, had it not been for Flores-Reyes' arrest, Hellwig may not have learned that Apartment 2 even existed. However, because the warrant lacked probable cause even with the FBI's information, the Court will not pass on whether it must excise this portion of Hellwig's affidavit as well.